### State of Vermont v. Gerald H. Brooks

[643 A.2d 226]

No. 93-018

Present: **Allen, C.J., Gibson, Dooley, Morse and Johnson, JJ.**

*Opinion Filed November 29, 1993*

Motion for Reargument Denied May 3, 1994

*Gary S. Kessler*, Supervising Appellate Prosecutor, State's Attorneys and Sheriffs Department, Montpelier, for Plaintiff-Appellant.

*Jeffrey L. Amestoy*, Attorney General, Montpelier, and *William E. Wargo*, Assistant Attorney General, Burlington, for Department of Health.

*Steve Dunham*, Public Defender, St. Albans, for Defendant-Appellee.

**Morse, J.** The State appeals from the district court's interlocutory ruling that evidence of blood-alcohol content (BAC) measured by DataMaster infrared testing device is inadmissible in either a DUI civil suspension or a DUI criminal proceeding. Well over one hundred cases were governed by the court's ruling. We reverse.

While driving a motor vehicle on Route 7 in St. Albans, defendant was stopped by a state trooper for an equipment defect. According to police affidavits, during the stop, the trooper suspected defendant was DUI and conducted field sobriety tests. Defendant eventually sub-

mitted to a DataMaster breath test, resulting in a BAC reading of .175%. Defendant requested a second DataMaster test, which was performed shortly after the first. The second test resulted in a BAC of .183%, a reading that deviated slightly less than 5% from the first. Defendant was then charged with DUI.

Defendant moved to exclude the DataMaster test results on grounds that the Department of Health had not properly promulgated rules to trigger a presumption of validity under 23 V.S.A. § 1203(d) ("analysis performed by the state shall be considered valid when performed according to a method or methods selected by the department of health") and because the DataMaster testing device did not conform to department performance standards. The court held the department had not satisfied the statute's rulemaking requirement. This determination was not appealed and is not before us.

The sole issue on appeal is whether the State is precluded from demonstrating the scientific reliability of the DataMaster infrared testing equipment and testing methodology, in general, and the trustworthiness of defendant's test result in particular. The trial court ruled that even if the State could show, without using the statutory presumption, that the test results were reliable, they would nonetheless be inadmissible. The court acknowledged that its ruling directly contradicted our holding in *State v. Mills*, 133 Vt. 15, 17, 328 A.2d 410, 411–12 (1974) (even if presumption of test's validity is not triggered, test results are admissible upon proper evidentiary foundation), but contended that *Mills* did not apply following the amendment of 23 V.S.A. § 1203, the statute governing the admissibility of the test. Defendant now urges that the amended version of 23 V.S.A. § 1203 requires a reevaluation of *Mills*.

In *Mills*, defendant contended that 23 V.S.A. § 1203(a) required the Department of Health to adopt rules for chemically testing breath samples before a given test result was admissible in a DUI prosecution. *Id.* at 16–17, 328 A.2d at 411. At the time *Mills* was decided, 23 V.S.A. § 1203(a) provided:

> Chemical analysis of the person's breath or blood shall be considered valid under the provisions of this section when performed according to methods approved by the department of health.

In 1989 the legislature amended that section, requiring that infrared testing methods be adopted by rulemaking and that such tests "*shall be analyzed* in compliance with rules adopted by the

department of health." 23 V.S.A. § 1203(d) (emphasis added). The legislature also provided an identical presumption of validity, stating: "[Infrared breath] analysis performed by the sate shall be considered valid when performed according to a method or methods selected by the department of health." *Id.* The one difference—an explicit mandate for rulemaking in the amended version—is the basis for defendant's contention that *Mills* is distinguishable and not contrary to the court's ruling that DataMaster evidence is inadmissible.

The trial court's initial rejection of the State's offer of the DataMaster evidence under a presumption of validity was mandated by § 1203(d) because rulemaking had not been properly conducted. The court, however, went further and inferred that § 1203(d) required suppression of the DataMaster results in any instance where rulemaking was not accomplished. This position is not borne out by analogous cases. In the absence of a specific legislative sanction, it is improper to infer consequences not provided in the statute. See, e.g., *State v. Skilling*, 157 Vt. 647, 648, 595 A.2d 1346, 1347 (1991) (statutory time periods to give notice and hold hearing in civil suspension for DUI, with no sanction provided for failure to comply, are directory only; consequences for failure to comply may not be judicially inferred); see also *In re Mullestein*, 148 Vt. 170, 174, 531 A.2d 890, 892–93 (1987) ("In the absence of express statutory language to the contrary," 26 V.S.A. § 201(b)'s requirement that candidates for architect's license be notified of exam results within 60 days is merely directory.). Furthermore, when interpreting the notice requirement for a license suspension under 23 V.S.A. § 1205(d), we held that the statute, with no mandated sanction for failure to comply, did not warrant the trial court's dismissal of charges against defendant for the State's alleged failure to give immediate notice within the time allotted. *State v. Camolli*, 156 Vt. 208, 215, 591 A.2d 53, 57 (1991).

Compliance with the statutory rulemaking requirement is mandatory only to the extent that the State wishes to benefit from the presumption of validity. The statute does not state or imply that department rulemaking is a prerequisite to admissibility. The trial court's reliance on § 1203(d) as a ground for denying admission of the DataMaster results was erroneous. Without a statutory basis for excluding the DataMaster test, the rules of evidence determine whether defendant's BAC results are admissible.

DUI test results may be proved by traditional evidentiary means, for, as we noted in *Mills*, despite the department's duty to use

rulemaking, "the judiciary has long had available to it a procedural and evidentiary framework to determine the validity of chemical analysis to establish [BAC]." *Mills*, 133 Vt. at 17, 328 A.2d at 411. This evidentiary framework, though not fully articulated in *Mills*, finds its foundation in the Vermont Rules of Evidence promulgated nearly a decade after *Mills* was decided. See V.R.E. 702–705 (rules for expert testimony and scientific evidence); see also V.R.E. 104(a) (preliminary questions of admissibility); V.R.E. 401–403 (relevance, admissibility, and exclusion of relevant evidence).

 Traditionally, the standard most widely applied for admissibility of scientific evidence was the *Frye* test, which allowed admission of scientific evidence if it was generally accepted as reliable in the relevant scientific community. *Frye v. United States*, 293 F. 1013, 1014 (D.C. Cir. 1923). The United States Supreme Court, however, recently held that the *Frye* test's restrictive view of admissibility was "superseded by the adoption of the Federal Rules of Evidence." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, — U.S. —, —, 113 S. Ct. 2786, 2793 (1993). In overruling the *Frye* test, the Court stated that "a rigid 'general acceptance' requirement would be at odds with the 'liberal thrust' of the Federal Rules and their 'general approach of relaxing the traditional barriers to "opinion" testimony.'" *Id.* at —, 113 S. Ct. at 2794 (quoting *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 169 (1988)). The Court further noted that decisions to admit evidence under F.R.E. 702 should be considered in context with the general requirements of admissibility of relevant evidence contained in F.R.E. 402 and 403, and in light of F.R.E. 104(a). *Id.* at —, 113 S. Ct. at 2794–96. Similar principles should apply here because Vermont's rules are essentially identical to the federal ones on admissibility of scientific evidence.

In *Mills*, the Court observed:

> "It is not required that the results of accepted chemical testing methods be infallible to be admissible. *If the test affords reasonable assistance to the triers of the fact,* technical shortages in the manner or method of proof may affect its weight but do not control its admissibility."

133 Vt. at 17, 328 A.2d at 411–12 (quoting *State v. Magoon*, 128 Vt. 363, 367, 264 A.2d 779, 781 (1970)) (emphasis added). Compare this standard with that for expert testimony articulated in V.R.E. 702:

> *If scientific, technical, or other specialized knowledge will assist the trier of fact* to understand the evidence or to determine

a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

V.R.E. 702 (emphasis added). Like any case in which scientific "facts" are at issue, the State should not be precluded from proving the reliability and accuracy of the DataMaster's infrared breath analysis with expert opinion. A contest over the "science" or the specific result may be decided by the trier of fact by weighing the expert testimony.

The trial court, on the other hand, believed that any "battle of the experts" would be against the legislative intent for efficient and speedy resolutions of DUI cases. It determined that allowing scientific evidence would not only be inefficient and time-consuming, given the substantial number of DUI prosecutions and civil suspensions heard, but would also be prohibitively expensive for the litigants. We doubt the burden is as great as the court predicted, and, although judicial economy and timeliness of disposition are important interests in the dispensation of justice, they cannot by themselves overcome the legislative mandate.

For the past two decades and during several amendments to the statutory scheme, the legislature has seen fit to let our interpretation in *Mills* stand. See *In re Dixon*, 123 Vt. 111, 115, 183 A.2d 522, 524 (1962) (that legislature had not seen fit to change the law tended to confirm propriety of earlier opinion). Further, if this law is to be changed "after having been consistently applied over a considerable period of time, then it is the legislature which should make the change, for 'it is . . . the legislature, not the courts, which has both the right and duty under our State Constitution to make the laws.'" *State v. Begins*, 148 Vt. 186, 191, 531 A.2d 595, 598 (1987) (Gibson, J., dissenting) (quoting *Langle v. Kurkul*, 146 Vt. 513, 528, 510 A.2d 1301, 1310 (1986) (Peck, J., dissenting)). We have been offered no persuasive reason to blunt the pointed intent of the legislature in passing the present DUI law, "to promote public safety and welfare and to lessen, so far as possible, the danger to the public from intoxicated persons driving on the highways." *State v. Mastaler*, 130 Vt. 44, 47, 285 A.2d 776, 778 (1971).

The trial court further reasoned that the DataMaster infrared test did not meet regulatory performance criteria. The Department of Health Regulation, Breath and Blood Alcohol Analysis 1(b), effective April 4, 1990, states:

> Analytical instrumentation shall be capable of analyzing *replicate* portions of a *known alcohol sample* with a precision of plus or minus 5% from their mean. The instrumentation shall be capable of determining the blood alcohol concentration of the *person sampled* with an accuracy of plus or minus 10%.*

(Emphasis added.) Unlike the crimper test, which captures a single exhaled breath in three segments of an indium tube for analysis, the DataMaster infrared test collects different breaths exhaled at separate times. In its decision, the trial court noted that it had seen other cases where the DataMaster had failed to analyze replicate breaths with an accuracy of plus or minus 5% from their mean. It therefore concluded that the department standard could not be achieved with the DataMaster and that evidence gathered by the machine must not be admitted.

. The language of the department regulation, however, defines the 5% deviation standard as a laboratory calibration requirement for the DataMaster, not, as the trial court asserted, a field performance criterion. In *State v. Robitaille*, we explained that the 5% deviation standard applied to the *one* breath crimper test, stating:

> The reason for the test of the second sample is to check the reliability of the first. The integrity of the testing may be in doubt due to flaws in the testing equipment, the taking of the sample, or the sampling equipment. If two tests produce similar results, the validity of the results is relatively high according to departmental regulation. If the two results vary more than 5% of their mean, however, the integrity of the tests is sufficiently in doubt to warrant discarding the results.

151 Vt. 380, 382, 561 A.2d 412, 413 (1989); see also *State v. Dole*, 141 Vt. 493, 494, 449 A.2d 979, 980 (1982) (when using crimper test, "regulations adopted pursuant to 23 V.S.A. § 1203(a) require two consistent samples for a valid analysis"). Given that the DataMaster

---

* The 1992 Breath and Blood Alcohol Analysis regulations C(I)(2) and C(I)(3), methods for breath-alcohol analysis, are essentially identical to the 1990 regulation 1(b) in regard to analytical accuracy requirements. They state:

 C(I)(2). Analytical instrumentation shall be capable of analyzing replicate samples of breath containing a known amount of alcohol with a precision of plus or minus 5% from their mean when alcohol concentrations are reported to three significant figures.

 C(I)(3). Analytical instrumentation shall be capable of determining the blood or breath alcohol concentration of the person sampled with an accuracy of plus or minus 10%.

infrared testing device analyzes *two separate* breaths, the 5% deviation rule will not apply. Regardless of the deviation rule applied, however, there is no evidence in this case that either standard was violated. In fact, the analysis of defendant's two separate breaths were within 5% of their mean.

In summary, the truth or falsity of an alleged scientific "fact" is not at issue in this appeal. DataMaster's trustworthiness as an "evidentiary test" under 23 V.S.A. § 1200(3) is still an open question, but, because the same issue may be determined under V.R.E. 104(a), the court's refusal to admit any evidence concerning the DataMaster process and results was erroneous.

*Reversed and remanded.*